**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**MICHAEL S. STORMS,**

                         **Plaintiff,**

    vs.                                        5:14-cv-01020
                                                         (MAD)

**COMMISSIONER OF SOCIAL SECURITY,**

                         **Defendant.**
_____

**APPEARANCES:**                                  **OF COUNSEL:**

**WALTER D. KOGUT, P.C.**              **WALTER D. KOGUT, ESQ.**
7000 East Genesee Street
Fayetteville, New York 13066
Attorney for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**    **AMANDA J. LOCKSHIN, AUSA**
Office of Regional General Counsel
Region II
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Michael S. Storms ("Plaintiff") commenced this action on August 15, 2014, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). *See* Dkt. No. 1.

### II. BACKGROUND

Plaintiff's date of birth is September 23, 1961, making Plaintiff forty years old on January 1, 2002, the alleged onset of his disability. *See* Dkt. No. 9, Administrative Transcript ("T."), at 177. Plaintiff completed his formal education in tenth grade, and he stated that he was enrolled in special education classes. *See id.* at 295. Plaintiff took the two or three hour exam to obtain his general equivalency diploma, but he did not pass. *See id.* at 38. Plaintiff has not completed any vocational or specialized job training. *See id.* at 183.

In the disability report, Plaintiff claimed he suffers from physical and mental conditions that limit his ability to work. *See id.* at 182. These conditions include carpal tunnel syndrome, sleep apnea, blurred vision, back pain, high blood pressure, and anemia. *See id.* Plaintiff has a limited, relevant work history. *See id.* at 156-62. In 2002, Plaintiff worked in a restaurant as a dishwasher for a couple months, and, prior to that, his only reported employment was as a short order cook in 1981 through 1989. *See id.* at 183. Plaintiff stopped working in May 2002 because the restaurant closed, but he believes that his medical conditions became disabling in January 2002. *See id.*

Plaintiff also completed the New York State Office of Temporary Disability Assistance questionnaire on February 14, 2011. *See id.* at 190-208. At that time, Plaintiff reported that he was able to bathe himself, cook and feed himself, use the facilities, and take medication on time. *See id.* Although, a friend reportedly helps Plaintiff to cook, do laundry, and clean the house. *See id.* at 193. Plaintiff claims that he is unable to do house or yard work because of his back problems and knee pain. *Id.* at 194. Plaintiff does not leave the house unless he has an appointment scheduled and then he walks or uses public transportation to travel. *See id.* Plaintiff also reported that he does shop for groceries in stores, but it takes him a long time. *See id.*

2

Plaintiff is able to go out alone. *See id.* According to Plaintiff, he is unable to pay bills, count change, or handle a saving account. *See id.* at 194-95.

Plaintiff reported that his activities included "coaching a football team" every other week and playing video games. *See id.* at 195. He reported that he spends time with others every other week, and he also goes to the library, community center, and appointments on a regular basis. *See id.* at 195. Plaintiff is able to walk one and a half blocks before he has to take a rest. *See id.* at 197. When asked if he has problems paying attention, Plaintiff responded that it is hard for him to understand what to do when "things come up." *See id.* He is not able to finish tasks such as math, reading, and other things because he does not understand it, but he is able to follow spoken instructions and sometimes he can follow written instructions. *See id.* He has trouble remembering when important things come up. *See id.* at 198. Plaintiff does not have any problems with people in positions of authority such as bosses or police officers. *See id.* at 197.

Plaintiff claims that he developed stabbing pain two years earlier (February 2009) in his lower back and right leg, and he started taking cyclobenzaprine for this pain in January 2011. *See id.* at 198-99. He experiences this pain everyday when he goes to sleep, and the pain lasts for twenty to thirty minutes. *See id.* at 199. Plaintiff also reported that the pain relief he gets from the medications does not last very long. *Id.* at 199.

A medicaid coordinator drove Plaintiff to the hearing on February 19, 2013 because Plaintiff has not ever had a driver's license. *See id.* at 31. At the hearing, Plaintiff complained that he suffers from carpal tunnel syndrome in both hands and has undergone surgery on his right hand. *See id.* at 32. The surgery did not provide relief for his symptoms, according to Plaintiff's testimony, but he previously described his post-carpal tunnel surgery condition as "okay" to Kalyani Ganesh, M.D. *See id.* at 39, 336. His hands are numb and tingly, which keep him from

3

buttoning his shirts and using zippers. *See id.* at 32-33. He also drops silverware, coins, cups, plates, the broom, and the mop because of the numbness in his hands. *See id.* at 33. The sleep apnea condition is treated with a continuous positive airway pressure (CPAP) machine at night when Plaintiff is sleeping. *See id.* Plaintiff does not have any symptoms from anemia, and his high blood pressure is controlled by medication. *See id.* at 33-34. When asked about the affects of depression, Plaintiff responded that the condition makes him feel nervous around certain people. *See id.* at 34.

Plaintiff testified at the hearing that he does not drink alcohol because he had a problem with alcohol when he was a teenager. *See id.* at 35. Although, he recently consumed a couple pitchers of beer and a couple glasses of liquor on his last birthday. *See id.* at 35. Plaintiff testified that he has a history of drug use having attended rehabilitation for crack cocaine and marijuana use in the past. *See id.* at 35, 40. Plaintiff attends a day treatment program five days per week for depression and anxiety. *See id.* at 35. At the time of the hearing, he was living alone and depended on a friend to cook for him and a friend to help him shop for groceries. *See id.* at 36. Although he previously indicated that he is able to bathe independently, Plaintiff testified that he is not able to completely bathe himself and someone assists him. *See id.* at 37. There is evidence that Plaintiff's girlfriend assists him with shopping, financing, and organizing his schedule. *See id.* at 294.

Plaintiff was divorced in 1998 and was the custodial parent of two children born in 1991 and 1997. *See id.* at 298. Plaintiff and his children were abandoned by his ex-wife, and he became their primary care provider from at least 2006 through at least 2010. *See id.* at 293, 298. During that period of time, Plaintiff worked closely with the Department of Social Services due to his difficulties raising his sons. *See id.* at 293.

On January 25, 2011, Plaintiff protectively filed applications for DIB and SSI. *See id.* at 147-54, 216-17. These applications were initially disapproved in a notice dated May 17, 2011. *See id.* at 55-65. Plaintiff requested a hearing by an administrative law judge, *see id.* at 68-69, and a video-conference hearing was conducted on February 19, 2013 before Administrative Law Judge Scott Staller (the "ALJ"), *see id.* at 27-54. The ALJ issued an unfavorable decision to Plaintiff on April 18, 2013. *See id.* at 7-22.

The ALJ made the following determinations: (1) Plaintiff met the insured status requirements of the Social Security Act through March 1, 2002; (2) Plaintiff has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date of disability; (3) Plaintiff's severe impairments include carpal tunnel syndrome, anemia, hypertension, obesity, obstructive sleep apnea, a cognitive disorder, major depressive disorder, and polysubstance abuse; (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listed impairment(s)"); (5) Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b); 416.967(b), and he is able to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, respond to usual work situations, and respond to changes in a routine work setting with some limitations; (6) Plaintiff does not have any past relevant work; and (7) considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *See id.* at 10-22. Therefore, the ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, from January 1, 2002 through the date of the ALJ's decision. *See id.* at 22.

Plaintiff timely filed a request for a review of the ALJ's decision with the Appeals Council, *see id.* at 4-5, and, in a notice dated June 27, 2014, the request was denied rendering the ALJ's decision the Commissioner's final decision, *see id.* at 1-3. Plaintiff then commenced this action for judicial review of the denial of his claims by the filing of a complaint on August 15, 2014. *See* Dkt. No. 1. Both parties have moved for judgment on the pleadings. *See* Dkt. Nos. 16, 21. The Court orders that the Commissioner's decision is reversed.

### III. DISCUSSION

**A. Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The Court must examine the administrative transcript to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and quotation marks omitted).

If supported by substantial evidence, the Commissioner's factual determinations are conclusive, and the court is not permitted to substitute its analysis of the evidence. *See*

*Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("[The court] would be derelict in its duties if we simply paid lip service to this rule, while shaping [the court's] holding to conform to our own interpretation of the evidence"). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.     Analysis**

*1. Disability analysis*

For purposes of both DIB and SSI, a person is disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There is a sequential, five-step analysis for evaluating these disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

7

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). After the third step, the ALJ assesses relevant medical evidence and other evidence and then determines the plaintiff's RFC, which is used in steps four and five. *See* 20 C.F.R. § 404.1520 (a)(4), (e). The plaintiff bears the burden on steps one through four, and then the Commissioner has the burden on the final step "of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa*, 168 F.3d at 77 (internal quotation marks omitted) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).

### *2. Listed Impairment*

At step three of the disability analysis, a plaintiff who meets or medically equals one of the listed impairments is "conclusively presumed to be disabled and entitled to benefits." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995). Plaintiff claims that the ALJ erred when he determined that Plaintiff's intellectual disability does not meet or medically equal a listed impairment under Sections 12.05(B) or 12.05(C) of 20 C.F.R. Part 404, Subpt. P, App. 1 ("§ 12.05(B), (C)"). *See* Dkt. No. 12 at 10-15. Specifically, Plaintiff argues that he meets the requirements of § 12.05(B) because he submitted substantial evidence that he has a full IQ score of 51. *See* Dkt. No. 12 at 10-15. Plaintiff also argues that there is substantial evidence that he has a physical impairment, obesity, in conjunction with a valid verbal, performance, or full scale IQ of 60 through 70. *See id.* at 14. The ALJ found that the full IQ scores did "not reflect the [Plaintiff's] true cognitive functioning" T. at 15. Accordingly, the ALJ concluded that Plaintiff's impairments do not meet or medically equal the listed impairment for intellectual disability. *See id.* The Court finds, as is set forth below, that the ALJ's determination is not supported by

8

substantial evidence. Moreover, the ALJ's analysis is encumbered by several legal errors, and, accordingly, the case is remanded back to the ALJ.

Section 12.05 states that "[i]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," which the regulation defines as before the age of twenty-two years. The required level of severity for an intellectual disorder are set forth in four subsections of the regulation. Section 12.05(B) provides that a valid verbal, performance, or full scale intelligence quotient ("IQ") of 59 or under meets the required severity. Section 12.05(C) requires that a plaintiff has a "valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Id.* (emphasis added). To meet the listed impairment of intellectual disability under § 12.05, a plaintiff also "must make a threshold showing that they suffer from 'significantly subaverage general intellectual functioning with deficits in *adaptive functioning*.'" *Casey v. Comm'r of Soc. Sec.*, No. 7:13-CV-0947, 2015 WL 5512602, *6 (N.D.N.Y. Sept. 15, 2015) (emphasis added) (citing *Burnette v. Colvin*, 564 Fed. Appx. 605, 607 (2d Cir. 2014)); *see also Talavera v. Astrue*, 697 F.3d 145, 153 (2015).

Adaptive functioning is defined as "an individual's [ ] ability to cope with the challenges of ordinary everyday life." *Talavera*, 697 F.3d at 153 (internal quotation marks omitted) (citing *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007)). Whether a plaintiff requires a "highly supportive" living environment in order to function is a pertinent question when determining deficits in adaptive functioning. *See West v. Comm'r Soc. Sec. Admin*, 240 Fed. Appx. 692, 698 (2d Cir. 2007) (considering daily living activities, social functioning, and ability to maintain attention and concentration). The Second Circuit interpreted the regulation language to mean that

9

the showing of plaintiff's deficits in adaptive functioning has to arise from the deficits in intellectual functioning and not from a physical ailment or other infirmity. *See id.*

Said another way, § 12.05 requires a showing of both, deficits in adaptive functioning – through daily living activities, social functioning, and concentration, persistence, or pace – and the requisite severity in cognitive function – through a valid IQ score (§ 12.05(B)) or a valid IQ score and other physical or mental limitation (§ 12.05(C)). The Court finds that the ALJ conflated cognitive functioning and adaptive functioning in his evaluation of intellectual disability under § 12.05. Instead of making separate determinations of Plaintiff's cognitive functioning and adaptive functioning for each prong of § 12.05, the ALJ impeached Plaintiff's IQ scores with Plaintiff's adaptive functioning skills, stating that the "scores do not reflect the claimant's true cognitive functioning as based on his reported adaptive functioning" and Plaintiff's "activities of daily living are inconsistent with the claimant's aforementioned cognitive scores." *See* T. at 14-15. Although the ALJ lists some factors of adaptive functioning, ultimately, the ALJ's conclusion is limited to finding that the IQ scores were invalid for purposes of meeting the listed impairment's severity prong on cognitive function. *See id.* at 15. The severity of Plaintiff's cognitive function, as found by the ALJ, is not supported by substantial evidence and it is unclear to the Court that the ALJ applied the appropriate legal standard.

While the Second Circuit has not held that an ALJ has the ability to find an IQ score invalid, the districts courts have found that generally an ALJ has this ability within his or her discretion but the basis for invalidating a score must be explained. *See Kennerson v. Astrue*, No. 10–CV–6591, 2012 WL 3204055, *9 (W.D.N.Y. Aug. 3, 2012); *Davis v. Astrue*, No. 7:06–CV–00657, 2010 WL 2925357, *5 (N.D.N.Y. July 21, 2010); *Miller v. Astrue*, No. 3:07-

CV-1093, 2009 WL 2568571, *7 (N.D.N.Y. Aug. 19, 2009). In this case, the ALJ invalidated the only two IQ scores in the record without sufficiently explaining the basis for doing so.

First, the ALJ impermissibly relied on selective evidence, failing to consider the whole record. *See Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 78-79 (N.D.N.Y. 2005); *Riechl v. Barnhart*, No. 02-CV-6169, 2003 WL 21730126, *12 (W.D.N.Y. June 3, 2003). Although evidence of developmental achievements, such as school history, can suffice as a reason to discount the validity of an IQ score, the ALJ relied on Plaintiff's attendance of GED preparation classes as evidence of having a higher cognitive ability than is represented by Plaintiff's IQ scores. *See* T. at 15. However, the ALJ does not mention that Plaintiff discontinued attendance of those classes because he was unable to comprehend the material and that Plaintiff was not able to pass the equivalency examination. *See id.* at 38-39. Another example of selective information relied on by the ALJ is the fact that Plaintiff helped raise two sons. *See id.* at 15. Again, the ALJ does not mention that Plaintiff worked closely with, and required assistance from, the Onondaga County Department of Social Services and the New York agency, Office of People with Developmental Disabilities, while raising his two sons because of "deficits in his parenting and life management skills." *Id.* at 293, 295, 298. The ALJ also does not mention that Plaintiff qualified as developmentally disabled for services with the New York Office for People with Developmental Disabilities. *See id.* at 291. The ALJ points out that Plaintiff reported that he coached a football team, but the ALJ left out Plaintiff's description that, as a volunteer, Plaintiff assisted in running drills set out by the coach. *See id.* at 294. In light of these selective facts that the ALJ relied upon, his explanation for invalidating the IQ scores is insufficient.

Second, in evaluating whether there is substantial evidence, the Court finds the following medical evidence of Plaintiff's mental impairments: (1) the mental residual functional capacity

assessment, the electronic request for medical advice, and psychiatric review technique form prepared by psychiatrist Dr. R. Altmansberger, (2) report of psychological evaluation prepared by Dr. Norman J. Lesswing, Ph.D., in 2008 and (3) a psychological assessment completed by Dr. Robert Sprafkin, Ph.D., in 2010. *See id.* at 291-301, 379-410, 419-20. Both Dr. Lesswing's and Dr. Sprafkin's assessments and examinations were conducted at the request of Plaintiff's social worker related to family services being provided by the Onondaga County's Department of Social Services. *See id.* at 293, 298. Plaintiff received services and assistance from the Onondaga County Department of Social Services and the Office for People with Developmental Disabilities while raising his two sons because of "deficits in his parenting and life management skills." *Id.* at 293, 295, 298.

In 2008, Plaintiff was sent by Onondaga County Department of Social Services ("Department for Social Services") for a psychological evaluation because Plaintiff exhibited signs of cognitive limitations. *See id.* at 298. Dr. Lesswing reviewed Plaintiff's records from his social worker, interviewed Plaintiff's social worker, completed a clinical examination of Plaintiff, and administered an IQ test. *See id.* at 298-301. Dr. Lesswing observed that Plaintiff was "extremely affable, engaging, positive, and pleasant in demeanor," and he also noted that Plaintiff was "expressive," "very talkative," and "articulate *relative* to his intellectual capabilities." *See id.* at 299 (emphasis added). Plaintiff's full IQ score was 63, and Dr. Lesswing notes that his scores across subtests and the verbal and performance IQ scores were very consistent. *See id.* at 300. Dr. Lesswing concluded that Plaintiff demonstrated extremely low intellectual functioning and his intellectual capabilities falls in the range of mild mental retardation. *See id.* at 301.

In 2010, Plaintiff was again referred by the Onondaga County Department of Social Services for a psychological assessment in order to obtain an estimate of his level of adaptive and

cognitive function. *See id.* at 293-96. Plaintiff reported that he was having a difficult time managing the needs of his sons and felt overwhelmed and on the edge of a mental breakdown. *See id.* at 293. The records also include a history of maladaptive behaviors such as being moody, throwing things, swearing, and raging three to four times per week. *See id.* at 294. Although Plaintiff was clean, polite, and cooperative with clear and fluid speech, Dr. Sprafkin noted that Plaintiff struggled through the assessment process, required considerable amounts of time to answer questions, and demonstrated frustration. *See id.* at 294. Dr. Sprafkin opined that Plaintiff was making every effort to answer the questions to the best of his ability observing that, although Plaintiff has some basic abilities with verbal and non-verbal skills, Plaintiff requires extended time to process information before responding to stimuli. *See id.* at 294.

Dr. Sprafkin administered an IQ test and Plaintiff scored a full scale IQ of 51. *See id.* The score indicates that Plaintiff is capable of functioning in the extremely low range of cognitive ability. *See id.* at 294. Dr. Sprafkin also administered a comprehensive measure test to assess adaptive skills, and Plaintiff score was in the extremely low range of ability. *See id.* at 295. According to Dr. Sprafkin, Plaintiff suffers from a cognitive disorder, and he specifically stated that, in his opinion, "this is an accurate assessment of [Plaintiff's] adaptive and cognitive abilities." *Id.* at 294.

When there is a claim for mental impairments the Commissioner requires further evaluation for the severity of the mental impairment using a special technique at the second and third steps of the five-step framework and at each level of administrative review. *See* 20 C.F.R. § 404.1520a; *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008). The "special technique" analysis is required to be documented. *See* 20 C.F.R. § 404.1520a(e). This documentation can be accomplished by having a medical or psychological consultant complete a standard document,

known as a Psychiatric Review Technique Form ("PRTF"). *See* 20 C.F.R. § 404.1520a(e)(1). Dr. Altmansberger completed the required form documenting the psychiatric review technique.

Dr. Altmansberger was a nonexamining consultant who based his opinions on the medical evidence in the record. *See id.* at 379-420. Dr. Altmansberger reported to the ALJ in May 2011 his assessment of Plaintiff's mental impairments up to the time of that assessment. *See id.* at 379, 393. Dr. Altmansberger specifically identified that he assessed Plaintiff for listed impairments of organic mental disorders (§ 12.02), affective disorders (§ 12.04), and substance addiction disorders (§ 12.09). This psychiatrist did not assess Plaintiff under the listed impairment of intellectual disability – then entitled mental retardation (§ 12.05). *See id.* at 383, 393, 397. Also of significance, Dr. Altmansberger's evalution does not include Plaintiff's most recent IQ scores from May 19, 2010 in his advice to the ALJ. *See id.* at 379-420.

The Court finds that Dr. Altmansberger's advice, mental residual functional capacity, and PRTF are not substantial evidence to support the ALJ's determination that Plaintiff does not meet or medically equal the listed impairment of an intellectual disability. The ALJ specifically relied on Dr. Altmansberger's assessment in his determination that Plaintiff does not meet or medically equal the listed impairment of intellectual disability under § 12.05 even though that intellectual disability was not considered by Dr. Altmansberger, and the 2010 IQ score was not considered in the evidence submitted by Dr. Altmansberger. *See id.* at 15, 379-420. Dr. Altmansberger briefly references the 2008 IQ score but does not offer any insight beyond, "not valid for SSN." *See id.* at 419. Also absent, is any reference to the conclusions of Dr. Lesswing and Dr. Sprafkin about Plaintiff's level of cognitive function. *See id.* at 379-420. In one unsupported line, Dr. Altmansberger concludes that Plaintiff has "no less than low BIF" (borderline intellectual functioning). *Id.* at 419.

14

Dr. Altmansberger's opinion, as a non-examining consultant, cannot serve as substantial evidence unless is it supported by medical reports of examining physicians. *See Spena v. Heckler*, 587 F. Supp. 1279, 1284 (S.D.N.Y. 1984) ("The opinion of a nonexamining doctor, however, cannot serve as substantial evidence to support an ALJ's decision when the opinion is unsupported by objective medical facts, conflicts with the examining physicians' opinions, and is contrary to the claimant's uncontroverted subjective evidence"); *Marbury v. Matthews*, 433 F. Supp. 1081, 1086 (W.D.N.Y. 1977). The Court finds that Dr. Altmansberger's opinions were not supported by the medical evidence of Plaintiff's mental disabilities because he disregarded the examining psychologists' examinations, assessments, testing, and conclusions in favor of his own conclusions without any basis.

Finally, the Court finds that the ALJ did not sufficiently develop the record in order to make a disability determination. It is axiomatic that, in light of the non-adversarial nature of the social security hearing, the ALJ has an affirmative duty to develop the record. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The duty stems from the regulation requiring the Commissioner to develop a complete medical record before making the disability determination. *See Pratts*, 94 F.3d at 37 (noting that the obligation is not dependant upon whether or not a claimant is represented by an attorney). The ALJ is not at liberty to reject a treating physician's medical opinions "without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. In this case, Dr. Altmansberger stated in 2011 that there was insufficient evidence to determine Plaintiff's mental impairments prior to 2002, *see id.* at 379, and, at the hearing in 2013, no additional evidence beyond what was already in the record was elicited from Plaintiff about the period of time prior to 2002, *see id.* at 27-54. The evidence of Plaintiff's

15

mental impairments and adaptive functions prior to 2002 is sparse in the record. The Court acknowledges that medical evidence in the form of records may no longer be obtainable. However, the Court directs the ALJ to obtain a consultative psychological examination to evaluate Plaintiff's cognitive function as well as an opinion on whether the cognitive deficits were present prior to 2002 and/or prior to age twenty-two. The Court also directs the ALJ to hold a hearing to obtain testimony from Plaintiff about his cognitive and adaptive functioning during those periods of time.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and, for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's decision denying disability benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**

Dated: March 14, 2016
      Albany, New York

_/s/ Mae A. D'Agostino_
Mae A. D'Agostino
U.S. District Judge